UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE No.:

**EDWARD WALLER,**

Plaintiff,

vs.

**COUNTRYWIDE HOME
LOANS, INC.**, et al.,

Defendants.

_____/

CIV-ALTONAGA

MAGISTRATE JUDGE
BROWN

# 08-23303

FILED by _____ D.C.

NOV 2 6 2008

STEVEN M. LARIMORE
CLERK U S DIST CT
S.D. of FLA. MIAMI

## NOTICE OF REMOVAL

### I. INTRODUCTION

Defendant Countrywide Home Loans, Inc. (**Countrywide**) removes the action pending in the Circuit Court in and for the Eleventh Judicial Circuit, Miami-Dade County, Florida, under case number: 08-63009-CA-20. The Circuit Court for the Eleventh Judicial Circuit, Miami-Dade County, Florida, is within the Southern District of Florida and within this division.

Removal is based on federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1441(b). Federal questions arises under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961, *et seq*. (**RICO**), and the Civil Rights Act of 1871 (**Civil Rights Act**), 42 U.S.C §§ 1983, 1985 and 1986.[1]

### II. PROCEDURAL COMPLIANCE

This notice of removal is timely pursuant to 28 U.S.C. § 1446(b). Plaintiff filed this action in the state court on October 17, 2008. The summers and complaint were served on

---

[1] The Court also has jurisdiction of plaintiff's claims under the Civil Rights Act pursuant to 28 U.S.C. § 1343(a)(1), (2) and (3).

Countrywide on November 12, 2008. Copies of the process, pleadings, orders, and other papers or exhibits on file with the state court are attached as **COMPOSITE EXHIBIT A** in compliance with 28 U.S.C. § 1446(a).

Contemporaneous with the filing of this notice of removal, the undersigned served a Notice of Filing Notice of Removal to Federal Court upon plaintiff as is required by 28 U.S.C. § 1446(d). A copy of that notice (without exhibits) is attached as **EXHIBIT B**. The original of that notice, with exhibits, is being filed with the Clerk of the Circuit Court for Miami-Dade County, Florida, in accordance with 28 U.S.C. § 1446(d).

The pleadings and papers on file in the Miami-Dade County Circuit Court show that no service returns have been filed with respect to the other defendants, and there is no other indication that any of those defendants have been served. (*See, generally,* COMPOSITE EX. A.) While the "rule of unanimity" generally requires that all defendants consent to removal of a case to federal court, *see Russell Corp. v. American Home Assurance Co.*, 264 F.3d 1040, 1044 (11th Cir. 2001), a recognized exception to the rule is that defendants not yet served with process need not join in removal. *See White v. Bombardier Corporation*, 313 F. Supp. 2d 1295, 1299-1300 (N.D. Fla. 2004) (consent of defendant not required where it had not been served at time of removal); *see also Gillis v. Louisiana*, 294 F.3d 755, 759 (5th Cir. 2002); *Brierly v. Alusuisse Flexible Packaging, Inc.*, 184 F.3d 527, 533 n.3 (6th Cir. 1999); *McKinney v. Board of Trustees*, 955 F. 2d 924, 925 (4th Cir. 1992). Thus, at this time, Countrywide may remove this case without seeking the consent of any other party.

As 28 U.S.C. § 1446(a) requires, the grounds for removal are set forth below.

### III. SUMMARY OF THE GROUNDS FOR REMOVAL

Removal is grounded upon federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1441(b). Federal questions are raised by plaintiff's allegations that Countrywide committed violations of RICO and of the Civil Rights Act.

The complaint, filed by plaintiff *pro se*, is prolix and largely incomprehensible; however, the federal nature of the claims plaintiff has attempted to allege is clear. Specifically, plaintiff alleges that Countrywide violated RICO because they "established a 'pattern of racketeering activity' by using the U.S. Mail more than twice to collect an unlawful debt." (Compl., at 18). In support of his RICO allegations, plaintiff expressly cites to 18 U.S.C. §§ 1341 and 1343, the federal mail fraud and wire fraud statutes. (*Id.*) Plaintiff also contends that he is entitled to relief under various sections of the Civil Rights Act. He alleges in the complaint that Countrywide "deprive[d] him of property" in violation of 42 U.S.C. § 1983, conspired to interfere with his civil rights in violation of 42 U.S.C. § 1985 or failed to prevent such interference in violation of 42 U.S.C. § 1986. (*Id.*)

Under 28 U.S.C. § 1331, the district courts of the United States have original jurisdiction of all civil actions arising under the Constitution, laws or treaties of the United States and as such have original jurisdiction over this action. Whether a claim arises under federal law so as to confer federal question jurisdiction under section 1331 is governed by the well-pleaded complaint rule. Under this doctrine, "federal jurisdiction exists . . . when a federal question is presented on the face of the plaintiff's properly pleaded complaint." *Caterpillar, Inc. v. Williams,* 482 U.S. 386, 392 (1987).

In this instance, plaintiff expressly asserts claims for relief under RICO and the Civil Rights Act. Claims alleging RICO violations are removable based upon federal question

jurisdiction. *See, e.g., Penn West Assoc., Inc.* v. *Cohen*, 371 F.3d 118, 123 (3d Cir. 2004) (removal of RICO claim properly based on federal question jurisdiction); *Bahari* v. *Countrywide Home Loans*, 2005 WL 3505604, at *2 (D. Md. Dec. 16, 2005) (denying motion to remand because RICO claims "involve the determination of substantial questions of federal law"). Similarly, plaintiff's claims under the Civil Rights Act present federal questions and are removable. *See, e.g., Rectory Park, L.C.* v. *City of Delray Beach*, 208 F. Supp. 2d 1320, 1325 (S.D. Fla. 2002) (removal of claims made under Section 1983 was proper); *Baldwin Hills Med. Group* v. *Los Angeles Co. Metropolitan Transp.*, 196 Fed. Appx. 567, 569 (9th Cir. 2006) (complaint alleging violations of sections 1983 and 1985 vested district court with federal question jurisdiction); *Williams* v. *Ragnone,* 147 F.3d 700, 702-03 (8th Cir. 1998) ("section 1983 claims brought in state court are removable pursuant to section 1441(a)"); *Nielson* v. *Soltis*, 41 F.3d 1516 (table), unpublished disposition, text at 1994 WL 589460, at *5 (10th Cir. 1994) ("it is clear the Defendants were entitled to remove this case to federal court, as the Plaintiff alleged federal claims under §§ 1983, 1985 and 1986 of the Civil Rights Act").

Plaintiff's complaint also appears to set forth state law claims for fraud, misrepresentation, breach of contract and rescission. These are supplemental claims that are properly within this Court's jurisdiction under 28 U.S.C. § 1367(a). Plaintiff's complaint shows these claims are inextricably intertwined with and form part of the same case or controversy as his RICO and Civil Rights Act claims, and the Court has supplemental jurisdiction over the state law claims under section 1367(a). *See City of Chicago* v. *International Coll. of Surgeons*, 522 U.S. 156, 165 (1997) (district court may exercise supplemental jurisdiction over state law claims that constitute "part of the same case or controversy" as claims arising under federal law); *Design Pallets, Inc.* v. *Gray Robinson, P.A.*, 2008 WL 4534256, at *1 (M.D. Fla. Oct. 7, 2008) (district

court had supplemental jurisdiction over state law claims where there was subject-matter jurisdiction over federal RICO claims).

## IV. CONCLUSION

Removal is proper because this matter obviously falls within this Court's subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1441(b). This Court has federal question jurisdiction because plaintiff's RICO and Civil Rights Act claims are clear from the face of the complaint. Countrywide has met all procedural requisites for removal, and this notice is timely filed. Countrywide respectfully requests the Court take jurisdiction over this matter and conduct all further proceedings in this case.

Respectfully submitted,

William P. Heller
Florida Bar No. 987263
e-mail: william.heller@akerman.com
Eric S. Matthew
Florida Bar No. 0026539
email: eric.matthew@akerman.com
**AKERMAN SENTERFITT**
350 East Las Olas Blvd., Suite 1600
Fort Lauderdale, Florida 33301
954-759-8945(ph)/954-463-2224 (fax)

*Counsel for Countrywide*

### CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served by U.S. mail this

26th day of November, 2008 to plaintiff *pro se* Edward Waller at 3370 NE 190th Street, Apt. #

3913, Aventura, FL 33180, and at 3370 Hidden Bay Drive, Apt 3913, Aventura, Fl 33180.

Eric S. Matthew

☐ IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA
☐ IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

| **DIVISION**<br>☐ CIVIL<br>☐ DISTRICTS<br>☐ FAMILY<br>☐ OTHER | **CIVIL COVER SHEET** | **CASE NUMBER**<br><br>0 8  6 3 0 0 9 CA 2 0 |
| --- | --- | --- |

| **PLAINTIFF**<br><br>EDWARD WALLER | **VS. DEFENDANT**<br><br>ANGELO R. MOZILO, C.E.O., CHAIRMAN,<br>ANDREW GISSINGER III, President and C.O.O.,<br>ERIC P. SIERACKI, C.F.O., COUNTRYWIDE *Et al.*,<br>R.K.ARNOLD, President and C.E.O. of MERS,<br>MORTGAGE ELECTRONIC REGISTRATION<br>SYTEMS | **CLOCK IN** |
| --- | --- | --- |

The civil cover sheet and the information contained here does not replace the filing and service of pleadings or other papers as required by law. This form is required by the Clerk of Court for the purpose of reporting judicial workload data pursuant to Florida Statute 25.075. See instructions and definitions on reverse of this form.

## TYPE OF CASE (Place an 'x' in one box only)

| **Domestic Relations** | **Torts** | **Other Civil** |
| --- | --- | --- |
| ☐ Simplified dissolution | ☐ Professional Malpractice | ☐ Contracts |
| ☐ Dissolution of Marriage | ☐ Products liability | ☐ Condominium |
| ☐ Support - IV-D | ☐ Auto negligence | ☒ Real property/Mortgage foreclosure |
| ☐ Support - Non IV-D | ☐ Other negligence | ☐ Eminent domain |
| ☐ UIFSA - IV-D | | ☐ Challenge to proposed Constitutional Amendment |
| ☐ UIFSA - Non IV-D | | ☐ Other |
| ☐ Domestic Violence | | |
| ☐ Other domestic relations | | |

| **Is Jury Trial Demanded in Complaint ?**   ☐ Yes ☐ No | DATE: *Oct. 17, 2008* |
| --- | --- |

**COMPLEX BUSINESS COURT**

This action is appropriate for assignment to Complex Business Court as delineated in the attached addendum pursuant to Administrative Order.  ☐ Yes ☐ No

Signature of Attorney for party initiating action: _____

**JUDGE:**

Clerk's web address: ww

**EXHIBIT**

A

**IN THE CIRCUIT COURT**

**IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

**GENERAL JURISDICTION DIVISION**

**CIVIL ACTION**

08 - 6 3 0 0 9 CA 2 0

CASE No. _____

EDWARD WALLER )
    Plaintiff )
     )
vs. )
     )
COUNTRYWIDE HOME LOANS, INC. )
     )
     )
ANGELO R. MOZILO, C.E.O., CHAIRMAN, )
COUNTRYWIDE, OR CURRENT OFFICE HOLDER )
ANDREW GISSINGER III, PRESIDENT AND CHIEF )
OPERATING OFFICER, COUNTRYWIDE HOME )
LOANS, INC. AND COUNTRYWIDE HOME LOANS, INC. )
D/B/A AMERICA'S WHOLESALE LENDER, )
OR CURRENT OFFICE HOLDER )
ERIC P. SIERACKI, CHIEF FINANCIAL OFFICER, )
EXECUTIVE MANAGING DIRECTOR, COUNTRYWIDE; )
R.K. ARNOLD, PRESIDENT AND C.E.O, "MERS" )
MORTGAGE ELETRONIC REGISTRATION )
SYSTEMS, INC; MERS CT CORPORATION SYSTEM )
     )
     )
    Defendants )
_____/

**COMPLAINT**

**PLAINTIFFS MEMORANDUM OF LAW IN SUPPORT OF BRIEF**

**CREDIT LOANS AND VOID CONTRACTS**
**PERFECT OBLIGATION AS TO A HUMAN BEING AS TO A BANK**

To the Honorable Judge of Said Court:

In Reference to Case No. 07-03109 CA 21
Countrywide Home Loans
Loan No. 107972397 ; First Mortgage; EXHIBIT A
Loan No. 107972389 ; Second Mortgage; EXHIBIT B

Subject Property Address:
3370 HIDDEN BAY DR., APT. 3913, AVENTURA, FLORIDA  33180

COMES NOW, Plaintiff, Edward Waller, offers this Memorandum of law in order for the Court to advance it's understanding of the complex legal issues, present and embodied in the Common Law, with authorities, law and cases in support of, which will constitute the following facts:

1. Defendants and other privately owned banks are making loans of "credit" with the intended purpose of circulating "credit" as "money".

2. Other financial institutions and individuals may "launder" bank credit that they receive directly or indirectly from privately owned banks.

3. This collective activity is unconstitutional, unlawful, in violation of Common Law, U.S. Code and the principles of equity.

4. Such activity and underlying contracts have long been held void, by State Courts, Federal Courts and the U.S. Supreme Court.

This Memorandum will demonstrate through authorities and established common law, that credit "money creation" by privately owned bank corporations is not really "money creation" at all.  It is the trade specialty and artful illusion of law merchants, which use old-time trade secrets of the Goldsmiths, to entrap the borrower and unjustly enrich the lender through usury and other unlawful techniques.  Issues based on law and the principles of equity, which are within the jurisdiction of this Court, will be addressed.

## HISTORY OF MONEY AND BANKING

**The Goldsmiths**

In his book, *Money and Banking* (8th Edition, 1984), Professor David R. Kamerschen writes on pages 56 - 63:

"The first bankers in the modern sense were the goldsmiths, who frequently accepted bullion and coins for storage ... One result was that the goldsmiths temporarily could lend part of the gold left with them . . . These loans of their customers' gold were soon replaced by a revolutionary technique. When people brought in gold, the goldsmiths gave them notes promising to pay that amount of gold on demand. The notes, first made payable to the order of the individual, were later changed to bearer obligations. In the previous form, a note payable to the order of Jebidiah Johnson would be paid to no one else unless Johnson had first endorsed the note ... But notes were soon being used in an unforeseen way. The note holders found that, when they wanted to buy something, they could use the note itself in payment more conveniently and let the other person go after the gold, which the person rarely did ...The specie, then tended to remain in the goldsmiths' vaults. . . . The goldsmiths began to realize that they might profit handsomely by issuing somewhat more notes than the amount of specie they held. . . These additional notes would cost the goldsmiths nothing except the negligible cost of printing them, yet the notes provided the goldsmiths with funds to lend at interest. . . .And they were to find that the profitability of their lending operations would exceed the profit from their original trade. The goldsmiths became bankers as their interest in manufacture of gold items to sell was replaced by their concern with credit policies and lending activities . . . They discovered early that, although an unlimited note issue would be unwise, they could issue notes up to several times the amount of specie they held. The key to the whole operation lay in the public's willingness to leave gold and silver in the bank's vaults and use the bank's notes. This discovery is the basis of modern banking."

On page 74, Professor Kamerschen further explains the evolution of the credit system:

"Later the goldsmiths learned a more efficient way to put their credit money into circulation. They lent by issuing additional notes, rather than by paying out in gold. In exchange for the interest-bearing note received from their customer (in effect, the loan contract), they gave their own non-interest bearing note. Each was actually borrowing from the other ... The advantage of the later procedure of lending notes rather than gold was that . . . more notes could be issued if the gold remained in the vaults ... Thus, through the principle of bank note issuance, *banks learned to create money in the form of their own liability.*"
[Emphasis Added]

Another publication which explains modern banking as learned from the Goldsmiths is *Modern Money Mechanics* (5th edition 1992), published by the Federal Reserve Bank of Chicago which states beginning on page 3:

"It started with the goldsmiths ..." At one time, bankers were merely middlemen. They made a profit by accepting gold and coins brought to them for safekeeping and lending the gold and coins to borrowers. But the goldsmiths soon found that the receipts they issued to depositors were being used as a means of payment. 'Then, bankers discovered that they could make loans merely by giving borrowers their promises to pay, or bank notes... In this way, banks began to create money ... Demand deposits are the modern counterpart of bank notes . . . It was a small step from printing notes to making book entries to the credit of

Page **3** of **28**

borrowers which the borrowers, in turn, could 'spend' by writing cheques, thereby printing *their own* money." [Emphasis added]

## MODERN MONEY AND BANKING

**How Banks Create Money**

In the modern sense, banks create money by creating "demand deposits." Demand deposits are merely "book entries" that reflect how much lawful money the bank owes its customers. Thus, all deposits are called demand deposits and are the bank's liabilities. The bank's assets are the vault cash plus all the "IOUs" or promissory notes that the borrower signs when they borrow either money or credit. When a bank lends its cash (legal money), it loans its assets, but when a bank lends its "credit" it lends its liabilities. The lending of credit is, therefore, the exact opposite of the lending of cash (legal money).

At this point, we need to define the meaning of certain words like "lawful money", "legal tender", "other money" and "dollars". The terms "Money" and "Tender" had their origins in Article 1, Sec. 8 and Article 1, Sec. 10 of the *Constitution of the United States*. 12 U.S.C. §152 refers to "gold and silver coin as lawful money of the United States" and was unconstitutionally repealed in 1994 in-that Congress **can not delegate** any portion of their constitutional responsibility without Amendment. The term "legal tender" was originally cited in 31 U.S.C.A. §392 and is now re-codified in 31 U.S.C.A. §5103 which states:

> **"United States coins and currency . . . are legal tender for all debts, public charges, taxes, and dues."**

The common denominator in both "lawful money" and "legal tender money" is that the United States Government issues both.

With Bankers, however, we find that there are two forms of money - one is government-issued, and privately owned banks such as Defendant, Regions Bank, issue the other. As we have already discussed government issued forms of money, we must now scrutinize privately issued forms of money. All privately issued forms of money today are based upon the liabilities of the issuer. There are three

common terms used to describe this privately created money: They are "credit", "demand deposits" and "checkbook money".

In the Sixth edition of Blacks Law Dictionary, p.367 under the term "Credit" the term "Bank credit" is described as: "Money bank owes or will lend a individual or person". It is clear from this definition that "Bank credit" which is the "money bank owes" is the bank's liability. The term "checkbook money" is described in the book "*I Bet You Thought*", published by the privately owned Federal Reserve Bank of New York, as follows:

> **"Commercial banks create checkbook money whenever they grant a loan, simply by adding deposit dollars to accounts on their books to exchange for the borrowers IOU . . . ."**

The word "deposit" and "demand deposit" both mean the same thing in bank terminology and refer to the bank's liabilities. For example, the Chicago Federal Reserves publication, "*Modern Money Mechanics*" states:

> **"Deposits are merely book entries ... Banks can build up deposits by increasing loans ... Demand deposits are the modern counterpart of bank notes.  It was a small step from printing notes to making book entries to the credit of borrowers which the borrowers, in turn, could 'spend' by writing checks."**

Thus, it is demonstrated in "Modern Money Mechanics" how, under the practice of fractional reserve banking, a deposit of $5,000 in cash could result in a loan of credit/checkbook money/demand deposits of $100,000 if reserve ratios set by the Federal Reserve are 5% (instead of 10%).

In a practical application, here is how it works. If a bank has ten people who each deposit $5,000 (totaling $50,000) in cash (legal money) and the bank's reserve ratio is 5%, then the bank will lend twenty times this amount, or $1,000,000 in "credit" money. What the bank has actually done, however, is to write a check or loan its credit with the intended purpose of circulating credit as "money." Banks know that if all the people who receive a check or credit loan come to the bank and demand cash, the bank will have to close its doors because it doesn't have the cash to back up its check or loan. The bank's check or loan will, however, pass as money as long as people have confidence in the illusion

**Page 5 of 28**

and don't demand cash. Panics are created when people line up at the bank and demand cash (legal money), causing banks to fold as history records in several time periods, the most recent in this country was the panic of 1933.

The process of passing checks or credit as money is done quite simply. A deposit of $5,000 in cash by one person results in a loan of $100,000 to another person at 5% reserves. The person receiving the check or loan of credit for $100,000 usually deposits it in the same bank or another bank in the Federal Reserve System. The check or loan is sent to the bookkeeping department of the lending bank where a book entry of $100,000 is credited to the borrower's account. The lending bank's check that created the borrower's loan is then stamped "Paid" when the account of the borrower is credited a "dollar" amount. The borrower may then "spend" these book entries (demand deposits) by writing checks to others, who in turn deposit their checks and have book entries transferred to their account from the borrower's checking account.

However, two highly questionable and unlawful acts have now occurred. The first was when the bank wrote the check or made the loan with insufficient funds to back them up. The second is when the bank stamps its own "Not Sufficient Funds" check "paid" or posts a loan by merely crediting the borrower's account with book entries the bank calls "dollars." Ironically, the check or loan seems good and passes as money -- unless an emergency occurs via demands for cash - or a Court challenge -- and the artful, illusion bubble, bursts.

**Different Kinds of Money**

The book, "*I Bet You Thought*", published by the Federal Reserve Bank of New York, states:

> **"Money is any generally accepted medium of exchange, not simply coin and currency. Money *doesn't* have to be intrinsically valuable, *be issued by a government* or be in any special form."** [Emphasis added]

Thus we see that privately issued forms of money only require public confidence in order to pass as money. Counterfeit money also passes as money as long as nobody discovers it's counterfeit. Like

wise, "bad" checks and "credit" loans pass as money so long as no one finds out they are unlawful. Yet, once the fraud is discovered, the values of such "bank money" like bad check's ceases to exist. There are, therefore, two kinds of money -- government issued legal money and privately issued unlawful money.

**Different Kinds of Dollars**

The dollar once represented something intrinsically valuable made from gold or silver. For example, in 1792, Congress defined the silver dollar as a silver coin containing 371.25 grains of pure silver. The legal dollar is now known as "United States coins and currency." However, the Banker's dollar has become a unit of measure of a different kind of money. Therefore, with Bankers there is a "dollar" of coins and a dollar of cash (legal money), a "dollar" of debt, a "dollar" of credit, a "dollar" of checkbook money or a "dollar" of checks. When one refers to a dollar spent or a dollar loaned, he should now indicate what kind of "dollar" he is talking about, since Bankers have created so many different kinds.

A dollar of bank "credit money" is the exact opposite of a dollar of "legal money". The former is a liability while the latter is an asset. Thus, it can be seen from the earlier statement quoted from *I Bet You Thought*, that money can be privately issued as: "Money doesn't have to ... be issued by a government or be in any special form."  It should be carefully noted that banks that issue and lend privately created money demand to be paid with government issued money. However, payment in like kind under natural equity would seem to indicate that a debt created by a loan of privately created money can be paid with other privately created money, without regard for "any special form" as there are no statutory laws to dictate how either private citizens or banks may create money.

**By What Authority?**

By what authority do state and national banks, as privately owned corporations, create money by lending their credit -- or more simply put - by writing and passing "bad" checks and "credit" loans as

"money"?  Nowhere can a law be found that gives banks the authority to create money by lending their liabilities.

Therefore, the next question is, if banks are creating money by passing bad checks and lending their credit, where is their authority to do so? From their literature, banks claim these techniques were learned from the trade secrets of the Goldsmiths. It is evident, however, that money creation by private banks is not the result of powers conferred upon them by government, but rather the artful use of long held "trade secrets." Thus, unlawful money creation is not being done by banks as corporations, but unlawfully by bankers.

Article I, Section 10, para. 1 of the *Constitution of the United States of America* specifically states that no state shall **"... coin money, emit bills of credit, make any Thing but gold and silver coin a Tender in Payment of Debts, pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligations of Contracts . . ."**[Emphasis added]  The states, which grant the Charters of state banks also, prohibit the emitting of Bills of credit by not granting such authority in bank charters.

It is obvious that "We the people" never delegated to Congress, state government, or agencies of the state, the power to create and issue money in the form of checks, credit, or other "bills of credit." The Federal Government today does not authorize banks to emit, write, create, issue and pass checks and credit as money. But banks do, and get away with it! Banks call their privately created money nice sounding names, like "credit", "demand deposits", or "Checkbook money". However, the true nature of "credit money" and "checks" does not change regardless of the poetic terminology used to describe them. Such money in common use by privately owned banks is illegal under Art. 1, Sec. 10, para. 1 of the Constitution of the United States of America, as well as unlawful under the laws of the United States and of this State.

**There Is No Mortgage!**

There is no mortgage, the mortgage was extinguished at closing. What is really going on is spelled out in

the instructions on the forms 1099A and 1099C and the 6209 Decoding Manual part 2 page 2-7 and part

4 page 4-9, where all 1099's are listed as class 5 Gift Taxes from an Estate or Trust which Plaintiff

formed by the registration of the Birth Certificate as a cestui que trust. The Defendant - depository

institution, by lack of full disclosure put deceptive verbage in the promissory note and security agreement,

that states that Plaintiff and alleged homeowner transferred all right, title and interest in the Real Estate,

Security,  [promissory note with a 12 month maturity. For clarity read USC title 15, section 78 C a 10]

and the Payables as the Plaintiff's asset at closing. Page 1 Box 1 right hand column at bottom of page

of the Instructions on the 1099C & 1099A, states that at the time of transfer all real estate and intangible

property, becomes abandoned property. Without full disclosure by Defendant - depository institution,

the Plaintiff - alleged homeowner, gave it away as a gift, which is why Defendant - depository institution

has to file the 1099's A & C as a gift tax. At foreclosure the court is sitting as a probate court

administering the trust assets of the estate as a gift tax according to the 1099's which they are supposed to

give alleged homeowners, Plaintiff, copies of according to the above instructions. If Plaintiff, homeowner

read the instruction manual for 1041 filings first page right hand column and form 709, when property is

transferred from a trust, they become the donor and have to pay the tax, which is what the court is

really trying to collect from homeowner and not a mortgage, remember, under House Joint Resolution

192 of June 5th 1933, lawful money of account was taken away by President Franklyn Delano Roosevelt

that being specie par value or gold and silver, therefore, there really is no money, so can there be a loan or

mortgage? Interested parties need to read USC title 26, sections 1040, 2001, 2002, 2032A, 2501, 2502,

2701, 2702, &2704 and IRS publications 544 & 950 (these are downloadable from www.irs.gov.)

This defendant - depository institution has become liable for the tax imposed by USC title 26, section

2001.

The Plaintiff now cites evidence for all the above allegations:

1)   "When the Southern states walked out of Congress on March 27, 1861, the quorum
to conduct business under the Constitution was lost.  The only votes that

Congress could lawfully take, under Parliamentary Law, were those to set the time to reconvene, take a vote to get a quorum, and vote to adjourn and set a date to reconvene at a later time, but instead, Congress abandoned the House and Senate without setting a date to reconvene.  Under the parliamentary law of Congress, when this happened, Congress became "sine die" (pronounced sign-die; literally "without day") and thus when Congress adjourned sine die, it ceased to exist as a lawful deliberative body, and the only lawful, constitutional power that could declare war was no longer lawful, or in session.

The Southern states, by virtue of their secession from the Union, also ceased to exist sine die, and some state legislatures in the Northern Block also adjourned sine die, and thus, all the states which were parties to creating the Constitution ceased to exist.

President Lincoln executed the first executive order written by any President on April 15, 1861, Executive Order 1, and the nation has been ruled by the president under executive order ever since.  When Congress eventually did reconvene, it was reconvened under the military authority of the Commander-in-Chief and not by Rules of Order for Parliamentary bodies or by Constitutional Law:  placing the American people under martial rule ever since that national emergency declared by President Lincoln. *(Emphasis mine)*

The Constitution for the United States of America temporarily ceased to be the law of the land, and the President, Congress, and the Courts unlawfully presumed that they were free to remake the nation in their own image, whereas, lawfully no constitutional provisions were in place which afforded power to any of the actions which presumed to place the nation under the new form of control. *(Emphasis mine)*

President Lincoln knew that he had no authority to issue any executive order, and thus he commissioned General Orders No. 100 (April 24, 1863) as a special field code to govern his actions under martial law and which justified the seizure of power, which fictionally implemented the provisions of Article I, Section 8, Clauses 17-18 of the Constitution beyond the boundaries of Washington, D.C. and into the several states.  General Orders No. 100, also called the Lieber Instructions and the Lieber Code, extended the Laws of War and International Law onto American soil, and the United States became the presumed conqueror of the people and the land.

Martial rule was kept secret and has never ended, the nation has been ruled under Military Law by the Commander-in-Chief of that military; the President, under his assumed executive powers and according to his executive orders, Constitutional Law under the original Constitution is enforced only as a matter of keeping public peace under the provisions of General Orders No. 100 under martial rule.

*Under Martial Law, title to property is a mere fiction, since all property belongs to the military except for that property which the Commander-in-Chief may, in his benevolence, exempted from taxation and seizure and upon which he allows the enemy to reside.*

President Lincoln was assassinated before he could complete plans for reestablishing constitutional government in the Southern States and end the martial rule by executive order, and the 14th Article in Amendment of the Constitution created a new citizenship status for the new expanded jurisdiction.  New laws for the District of Columbia were established and passed by Congress in 1871, supplanting those of February 27, 1801 and May 3, 1802.  The District of Columbia was re-incorporated in 1872, and all states in the Union were reformed as Franchisees of the Federal Corporation so that a new Union of the United States could be created.  The key to when the states became Federal Franchisees is related to the date when such states enacted the Field Code in law.  The Field Code was a codification of the common law that was adopted first

by New York, and then by California in 1872, and shortly afterwards the Lieber Code was used to bring the United States into the 1874 Brussels Conference and into the Hague Conventions of 1899 and 1907.

*Excerpted from the Introduction of Senate Report 93-549, War and Emergency Powers Acts*

THE BUCK ACT

The United States government may not tax those state Citizens who live and work outside the territorial jurisdiction of Article 1, Section 8, Clause 17 or Article 4, Section 3, Clause 2 of the United States Constitution.

In 1940, Congress passed the "Buck Act", 4 U.S.C.S., Sections 105-113. Section 110(e) authorized any department of the federal government to create a "federal area" for imposition of the "Public Salary Tax Act of 1939" 4 U.S.C.S. Sec. 111. The balance of that act is found in the Internal Revenue Code.

4 U.S.C.S. Sec 110(d). The term "State" includes any Territory or possession of the United States.

4 U.S.C.S. Sec. 110(e). The term "federal area" means any lands or premises held or acquired by or for the use of the United States or any department, establishment, or agency of the United States; and any Federal area, or any part thereof, which is located within the exterior boundaries of a New York State, shall be deemed to be a Federal area located within such State.

The legal consequence of that Act was to create 1) Federal areas throughout the 48 constitutional states which overlaid exactly those states, and to illegally convert state Citizens into the status of "Federal citizens", and 2) illegally usurp the Sovereignty of the several states.

3. Creation of Franchise STATES.

The Federal Areas created under the Buck Act were named by the Federal government with the name of the state included within its borders, but spelled in all capitals, or with specific two letter all-capitals abbreviations.

The reason for this is clear since there is a legal rule that two different legal entities may not have the same name, however the legal documentation for this instance has not yet been found in the United States Code, the Code of Federal Regulations, or any other official United States legal publication.

Probably the reason for that omission in United States legal documents and statutes is that "THE UNITED STATES OF AMERICA CORPORATION." was created in France shortly after the end of the United States Civil War. The evidence of said incorporation is in French legal archives, so they cannot be found in this country, but inference of that corporation and its activities comes from the highest sources. I quote a letter from President Franklin D. Roosevelt written November 21, 1933 to Colonel Mandell House:

*"The thing to find out, and I'm hoping the corporate records will show, is who are the shareholders? Who is on the Board of directors of the 'UNITED STATES OF AMERICA? ..."*

That this is this situation is clearly constitutionally both illegal and unlawful is evident as the United States Constitution states in Article IV, Section3, Paragraph 1, "New states may be admitted by the Congress to the Union, but no new state shall be formed or created within the jurisdiction of any other

state; nor any state be formed by the junction of two or more states or parts of states, without the consent of the legislatures of the states concerned as well as of the Congress."

That term imposed by the Constitution supersedes any provision of the Buck Act which is in conflict, and in fact, it will be shown by statute to be such by the Plaintiff.

Immediately after the Bank Holiday of March 5, 1933, one day after FDR's inauguration he sent a bill to Congress establishing a four day "Banking Holiday," It was passed by Congress and immediately put into effect. A not-generally-recognized fact is that the United States also "declared bankruptcy" at the same time. At that point, the United States government was gradually taken over by the CORPORATE UNITED STATES which certainly was owned by European parties to whom it owed money which it could not pay.

Soon after the establishment of the Buck Act in 1940, the new administrative areas became STATES which were given the status of STATE FRANCHISES by the UNITED STATES OF AMERICA CORPORATION.

For example, THE STATE OF FLORIDA is in reality a franchise of the UNITED STATES OF AMERICA CORPORATION, and is an entity which is precisely not the Constitutional State of Florida, yet it governs this state and enforces its laws as though it possesses legal Constitutional legitimacy—it legally and lawfully does not.

4.   In like fashion, THE FLORIDA BANKING SYSTEM are a corporate entity under the control of the STATE OF FLORIDA and the AMERICAN BANKING ASSOCIATION, COUNTRYWIDE HOME LOANS, in identical fashion are not authorized to enforce any State of Florida law or statute.
5.   As the UNITED STATES OF AMERICA CORPORATION is both a foreign and a municipal corporation, the STATE OF FLORIDA is a municipal corporation, and the AMERICAN BANKING ASSOCIATION or COUNTRYWIDE HOME LOANS, is an adjunct to the STATE OF FLORIDA, none have either the United States Constitution or the State of Florida Constitution authority to enforce State of Florida statute. Their collective and only authority extends to parties which are in contractual relationship with them, either individually or collectively—actual or adhesive.
Plaintiff's trustee claims that Plaintiff and Plaintiff's trustee are not parties to contracts of any type or sort with the STATE OF FLORIDA or any of its parts. Plaintiff's trustee claims that Plaintiff and Plaintiff's trustee are not parties to contracts of any type or sort with COUNTRYWIDE HOME LOANS and/or any of its parts if all were based on fraud and deception and hereby rescind any all signatures on any and all contracts, agreements whether written, implied or verbal. Consequently Plaintiff and Plaintiff's trustee have no legal obligation to any State of Florida law, the STATE OF FLORIDA, or COUNTRYWIDE HOME LOANS and either attempts to enforce, or actually enforces.
Plaintiff claims The STATE OF FLORIDA or COUNTRYWIDE HOME LOANS has no rights, legal or otherwise, to enforce the statutes of the State of Florida, but illegally and unlawfully does so. That is the case in this specific instance as well as others, and both the STATE OF FLORIDA and the FLORIDA BANKING SYSTEM and/or The AMERICAN BANKING ASSOCIATION, in this case COUNTRYWIDE HOME LOANS, their officers and employees who so act, have committed both the high crimes of Fraud, Conspiracy to Defraud, Unjust Enrichment by Fiat Currency and Fractionalizing Deception, False Advertising, Deceptive Trade Practices and Gross Misrepresentation of Material Facts, Treason and Sedition. Plaintiff will prove these claims and allegations.
Plaintiff and/or Plaintiff's representative reserve the right to bring suit against the STATE OF FLORIDA and COUNTRYWIDE HOME LOANS, their legal representatives, and their specific officers and employees who are in any fashion or way involved in this case.

## THE DECEPTION FROM OWNER TO TENANT

Let's start off with some definitions from Black's Law Dictionary.

Straw man -- (states in part) A fictitious person; A third party used in some transactions as a temporary transferee to allow the principal parties to accomplish something that is otherwise impermissible.

Settlor – The grantor or donor in a deed of settlement. Also one who creates a trust. One who furnishes consideration for the creation of a trust.

Trustor – see settlor.

Grantor – The person by whom a grant is made. A transferor of property. The creator of a trust is usually designed as the grantor of the trust.

Trustee – Person holding property in trust. The person appointed or required by law to execute a trust.

Beneficiary – One who benefits from the act of another. As it relates to trust beneficiaries, includes a person who has any present or future interest, … includes any person entitled to enforce the trust.

Grantor Trust – A trust in which the grantor transfers or conveys property in trust …

Deed of Trust – An instrument in use in some states, taking the place and serving the uses of a mortgage, by which the legal title to real property is placed in one or more trustees, to secure the repayment of a sum of money or to perform other conditions. Though differing in form from mortgage, it is essentially a security.

In most states, when you close on a house at the title company, one of the documents that you sign is a Deed of Trust. Plaitiff will describe what happens with these documents.

You will notice that the Settlor is John, who is a real man. But the person whose name is on the Deed of Trust is JOHN (John's name in all upper case letters) who is a straw man or a legal fiction. John's legal fiction, JOHN, was created when his birth certificate was issued by the state in which we was born. Evidence of straw man can be seen everywhere. Look on your driver's license, your checks, anything you

get from any government agency. None of these entities can deal with John, the man. They all have to deal with JOHN, the "strawman", *see above Black's Law Dictionary definition*. Look on your personal checks at the signature. Most will have "MP" at the end of the signature line. If you were to look at the signature line under high magnification, you would see that it's not a solid line but rather it is micro-print which says "AUTHORIZED REPRESENTATIVE" over and over again. John is JOHN's authorized agent. JOHN can't sign any papers since he has no hands. So John signs for JOHN.

The agent for the closing on the property is the title company and the mortgage company is the beneficiary of the Deed of Trust. The bank is the beneficiary so they can receive the payment on the loan. However, this is a scam. When John signs a promissory note, he creates money (Google and see the *MODERN MONEY MECHANICS* article). This publication says "What a depository institution like COUNTRYWIDE HOME LOANS does when they make loans is to accept promissory notes [the one signed by John] in exchange for credits to the borrowers' transaction accounts." This means that the mortgage company accepts John's promissory note and then loan's JOHN credit in the same amount. The word "exchange" above means "To barter or swap. To part with, give or transfer for an equivalent. ... Act of giving or taking one thing for another." The mortgage company, which is really a bank, **doesn't loan any of its own money or the money of it's depositors**. Signing a note for $100,000 creates $100,000. This money is put in an account and a check is written to the seller of the house (BOB, another strawman). *__At this point, the house is paid for in full. The money was created by John when he signed the note. The bank didn't provide any consideration or substance in this exchange.__* Yet most people believe they should pay on the note for 15 to 30 years. What we are really doing is paying a lease on the house. The next two steps will show how this happens.

The Deed of Trust causes a Grantor Trust to be created. We know this is true because the Deed of Trust contains the word "grantor" which means an implied Grantor Trust is created. JOHN is the Grantor which means he grants or gives the house into the trust. The mortgage company is still the beneficiary. This Grantor Trust conveys the property from the owner, JOHN (remember he paid for the property in full) to a trust where the bank gets the benefit of the trust. The benefit will be your payments.

The third thing that is created, by implication, is a lease agreement. JOHN is the tenant, and the mortgage company is the beneficiary, they are receiving the payments. So JOHN has been converted from the owner to a tenant. If you are angry at this point, you have a right to be. You have been converted from an owner to a tenant.

If you breech the Deed of Trust, then the Deed of Trust dies. So a will is needed. JOHN becomes the one who creates the will, the Testor. The mortgage company assigns a substitute trustee to conduct a foreclosure. The mortgage company is the heir of JOHN's estate so they benefit from the property even though JOHN owned it.

## Void "ULTRA VIRES" Contracts

*Black's Law Dictionary* defines the Latin term "extra vires" to mean beyond powers. *Black's Law Dictionary* explains the term "ultra vires" embraces "[a]n act performed without any authority to act on subject. *Haslund v. City of Seattle,* 86 Wash.2d 607, 547 P.2d 1221, 1230. Acts beyond the scope of the powers of a corporation, as defined by its charter or laws of state of incorporation. *State ex rel. v. Holston Trust Col,* 168 Tenn. 546, 79 S.W.2d 1012, 1016. The term has a broad application and includes not only acts prohibited by the charter, but acts which are in excess of powers granted and not prohibited, and generally applied either when a corporation has no power whatever to do an act, or when the corporation has the power, but exercises it irregularly. *People ex rel. Barrett v. Bank of Peoria,* 295 Ill.App. 543, 15 N.E.2d 333, 335. Act is ultra vires when corporation is without authority to perform it under any circumstances or for any purpose. By doctrine of ultra vires a contract made by a corporation beyond the scope of its corporate powers is unlawful. *Community Federal Sav. & Loan Ass'n of Independence, Mo. v. Fields, C.C.A., Mo.,* 128 F.2d 705, 708." *Black's* 6th Edition, p. 1522.

The courts have long held that when a corporation executes a contract beyond the scope of its charter or granted corporate powers, the contract is void or "ultra vires".

1. In *Central Transp. Co. v. Pullman*, 139 U.S. 60, 11 S. Ct. 478, 35 L. Ed. 55, the court said: "A contract *ultra vires* being unlawful and void, not because it is in itself immoral, but because the corporation, by the law of its creation, is incapable of making it, the courts, while refusing to maintain any action upon the unlawful contract, have always striven to do justice between the parties, so far as could be done consistently with adherence to law, by permitting property or money, parted with on the faith of the unlawful contract, to be recovered back, or compensation to be made for it. In such case, however, the action is not maintained upon the unlawful contract, nor according to its terms; but on an implied contract of the defendant to return, or, failing to do that, to make compensation for, property or money which it has no right to retain. To maintain such an action is not to affirm, but to disaffirm, the unlawful contract."

2. "When a contract is once declared ultra vires, the fact that it is executed · does not validate it, nor can it be ratified, so as to make it the basis of suitor action, nor does the doctrine of estoppel apply." *F& PR v. Richmond*, 133 SE 898; 151 Va 195.

3. "A national bank ... cannot lend its credit to another by becoming surety, indorser, or guarantor for him, such an act ; is ultra vires . . ." *Merchants' Bank v. Baird* 160 F 642. (Additional cases are cited as footnotes at the end of this Memorandum.)

**The Question of Lawful Consideration**

The issue of whether the lender who writes and passes a "bad" check or makes a "credit" loan has a claim for relief against the borrower is easy to answer, providing the lender can prove that he gave a lawful consideration, based upon lawful acts. But did the lender give a lawful consideration? **To give a lawful consideration, the lender must prove that he gave the borrower lawful money such as coins or currency. Failing that, he can have no claim for relief in a court at law against the borrower as the lender's actions were ultra vires or void from the beginning of the transaction.**

It can be argued that "bad" checks or "credit" loans that pass as money are valuable; but so are counterfeit coins and currency that pass as money. It seems unconscionable that a bank would ask homeowners to put up a homestead as collateral for a "credit loan" that the bank created out of thin air. Would this court of law or equity allow a counterfeiter to foreclose against a person's home because the borrower was late in payments on an unlawful loan of counterfeit money? Were the court to do so, it would be contrary to all principles of law.

The question of valuable consideration in the case at bar, does not depend on any value imparted by the lender, but the false confidence instilled in the "bad" check or "credit" loan by the lender. In a court at law or equity, the lender has no claim for relief. The argument that because the borrower received property for the lender's "bad" check or "credit" loan gives the lender a claim for relief is not valid, unless the lender can prove that he gave lawful value. The seller in some cases who may be holding the "bad" check or "Credit" loan has a claim for relief against the lender or the borrower or

both, but the lender has no such claim.

**Borrower Relief**

Since we have established that the lender of unlawful or counterfeit money has no claim for relief under a void contract, the last question should be, does the borrower have a claim for relief against the lender?

First, if it is established that the borrower has made no payments to the lender, then the borrower has no claim for relief 'against the lender for money damages. But the borrower has a claim for relief to void the debt he owes the lender for notes or obligations unlawfully created by an ultra vires contract for lending "credit" money.

**The borrower, the Courts have long held, has a claim for relief against the lender to have the note, security agreement, or mortgage note the borrower signed declared null and void.**

The borrower may also have claims for relief for breach of contract by the lender for not lending "lawful money" and for "usury" for charging an interest rate several times greater than the amount agreed to in the contract for any lawful money actually risked by the lender. For example, if on a $100,000 loan it can be established that the lender actually risked only $5,000 (5% Federal Reserve ratio) with a contract interest rate of 10%, the lender has then loaned $95,000 of "credit" and $5,000 of "lawful money". However, while charging 10% interest ($10,000) on the entire $100,000. The true interest rate on the $5,000 of "lawful money" actually risked by the lender is 200% which violates Usury laws of this state. If no "lawful money" was loaned, then the interest rate is an infinite percentage. Such techniques the bankers say were learned from the trade secrets of the Goldsmiths.

The Courts have repeatedly ruled that such contracts with borrowers are wholly void from the beginning of the transaction, because banks are not granted powers to enter into such contracts by either state or national charters.

**Additional Borrower Relief**

In Federal District Court the borrower may have additional claims for relief under "Civil RICO" Federal Racketeering laws (18 U.S.C. §1964). The lender may have established a "pattern of racketeering activity" by using the U.S. Mail more than twice to collect an unlawful debt and the lender may be in violation of 18 U.S.C. §§§§1341, 1343, 1961 and 1962. The borrower may have other claims for relief if he can prove there was or is a conspiracy to deprive him of property without due process of law under. (42 U.S.C.§§§1983 (Constitutional Injury), 1985(Conspiracy) and 1986 ("Knowledge" and "Neglect to Prevent" a U.S. Constitutional Wrong), Under 18 U.S.C.A.§ 241 (Conspiracy) violators, "shall be fined not more than $10,000 or imprisoned not more than ten (10) years or both."

In a Debtor's RICO action against its creditor, alleging that the creditor had collected an unlawful debt, an interest rate (where all loan charges were added together) that exceeded, in the language of the RICO Statute, "twice the enforceable rate." The Court found no reason to impose a requirement that the Plaintiff show that the Defendant had been convicted of collecting an unlawful debt, running a "loan sharking" operation. The debt included the fact that exaction of a usurious interest rate rendered the debt unlawful and that is all that is necessary to support the Civil RICO action. Durante Bros. & Sons, Inc. v. Flushing Nat 'l Bank. 755 F2d 239, Cert. denied, 473 US 906 (1985).

The Supreme Court found that the Plaintiff in a civil RICO action, need establish only a criminal "violation" and not a criminal conviction. Further, the Court held that the Defendant need only have caused harm to the Plaintiff by the commission of a predicate offense in such a way as to constitute a "pattern of Racketeering activity." That is, the Plaintiff need not demonstrate that the Defendant is an organized crime figure, a mobster in the popular sense, or that the Plaintiff has suffered some type of special Racketeering injury; all that the Plaintiff must show is what the Statute specifically requires. The RICO Statute and the civil remedies for its violation are to be liberally construed to effect the congressional purpose as broadly formulated in the Statute. Sedima, SPRL v. Imrex Co., 473 US 479 (1985).

# CASE CITES IN SUPPORT

## ULTRA VIRES CONTRACTS

1. "A contract is ultra vires being unlawful and void, not because it is in itself immoral, but because the corporation, by the law of its creation, is incapable of making it. The courts, while refusing to maintain any action upon the unlawful contract, have always striven to do justice between the parties, so far as could be done consistently with adherence to law, by permitting property or money, parted with on the faith of the unlawful contract, to be recovered back, or compensation to be made for it. In such case, however, the action is not maintained upon the unlawful contract, nor according to its terms; but on an implied contract of the defendant to return, or failing to do that, to make compensation for, property or money which it has no right to retain. To maintain such an action is not to affirm, but to disaffirm the unlawful contract." *Pullman v. Central Transp. Co.*, 139 U.S. 62, 11 S.Ct. 478, 35 L.Ed. 55

2. "When a contract is once declared ultra vires, the fact that it is executed does not validate it, nor can it be ratified, so as to make it the basis of suit or action, nor does the doctrine of estoppel apply." *F&PR v. Richmond*, 133 SE 898; 151 Va. 195.

3. "A national bank . . . cannot lend its credit to another by becoming surety, indorser or guarantor for him, such an act is ultra vires . . ." *Merchants Bank v. Baird,* 160 F 642.

## LOAN OF CREDIT

4. "In the federal courts, it is well established that a national bank has not power to lend its credit to another by becoming surety, endorser, or guarantor for him." *Farmers and Miners Bank v. Bluefield Nat'l Bank,* 11 F.2d 83, 271 U.S. 669.

5. "A national bank has no power to lend its credit to any person or corporation." *Bowen v. Needles Nat. Bank,* 94 F. 925; 36 CCA 553, certiorari denied In 20 S.Ct. 1024, 176 US 682, 44 L.Ed 637.

6. "Mr. Justice Marshall said: 'The doctrine of ultra vires is a most powerful weapon to keep private corporations within their legitimate spheres and to punish them for violations of their corporate charters, and it probably is not invoked too often . . .'" *Zinc Carbonate Co. v. First National Bank,* 103 Wis. 125, 79 NW 229, *American Express Co. v. Citizens State Bank*, 194 NW 430.

7. "A bank may not lend its credit to another, even though such a transaction turns out to have been of benefit to the bank, and in support of this a list of cases might be cited, which would look like a catalog of ships." *Norton Grocery Co. v. Peoples Nat. Bank,* 144 SE 505, 151 Va 195.

8. "It has been settled beyond controversy that a national bank, under federal law being limited in its powers and capacity, cannot lend its credit by guaranteeing the debts of another. All such contracts entered into by its officers are ultra vires. . ." *Howard & Foster Co. v. Citizens Nat'l Bank of Union*, 133 SC 202, 130 SE 759 (1926).

9. ". . . checks, drafts, money orders and bank notes are not lawful money of the United States . . ." *State v. Neilon,* 73 Pac. 324, 43 Ore. 168.

10. "Neither, as included in its powers, nor incidental to them, is it a part of a bank's business to lend its credit. If a bank could lend its credit as well as its money, it might, if it received compensation and was careful to put its name only to solid paper, make a great deal more than any lawful interest on its money would amount to. If not careful, the power would be the mother of panics . . . Indeed, lending credit is the exact opposite of lending money which is the real business of a bank, for while the latter creates a liability in favor of the bank, the former gives rise to a liability of the bank to another." 1 Morse, *Banks and Banking,* 5th Ed. Sec. 65; Magee, *Banks and Banking,* 3rd Ed. Sec. 248." *American Express Co. v. Citizens State Bank,* 194 NW 429.

11. "It is not within those statutory powers for a national bank, even though solvent, to lend its credit to another in any of the various ways in which that might be done." *Federal Intermediate Credit Bank v. L. Herrison,* 33 F.2d 841, 842 (1929).

12. "There is no doubt but what the law is that a national bank cannot lend its credit or become an accommodation endorser." *National Bank of Commerce v. Atkinson,* 56 F. 471.

13. "A bank can lend its money, but not its credit." *First Nat'l Bank of Tallapoosa v. Monroe,* 135 Ga 614, 69 F. 1124, 32 LRA (NS) 550.

14. ". . . the bank is allowed to lend money upon personal security, but it must be money that it loans, not its credit." *Sellgman v. Charlottesville Nat. Bank,* 3 Hughes 647, Fed. Case No. 12, 642, 1039.

15. "The Bank's act of creating credit is not authorized by the Constitution and Laws of the United States, is unconstitutional and void, and is not a lawful consideration in the eyes of the Law to support any thing or upon which any lawful right can be built." ***The Credit River Decision,*** *First National Bank of Montgomery v. Jerome Daly, December 1968, In the Justice Court, State Of Minnesota, County Of Scott, Township Of Credit River, Justice Martin V. Mahoney.*

## LOANS OF MONEY

15. "A loan may be defined as the delivery by one party to, and the receipt by another party of, a sum of money upon an agreement express or implied, to repay the sum with or without interest." *Parsons v. Fox,* 179 Ga 605, 176 SE 644. Also see Kirkland *v. Bailey,* 155 SE 2d 701, and *United States v. Neifert White Co.,* 247 Fed.Supp. 878, 879. "The word 'money' in its usual and ordinary acceptation means gold, silver, or paper money used as a circulating medium of exchange. . ." e.v. *Railey* 280 Ky 319, 133 SW2d 75.

## PROMISE TO PAY NOT EQUIVALENT TO PAYMENT

16. "A promise to pay cannot, by argument, however ingenious, be made the equivalent of actual payment . . ." *Christensen v. Beebe,* 91 P 133, 32 Utah 406.

17. "A check is merely an order on a bank to pay money." *Young v. Hembree,* 73 P2d 393.

## HOLDER IN DUE COURSE

18. "A bank is not the holder in due course upon merely crediting the depositor's account." *Bankers Trust v. Nagler,* 229 NYS2d 142, 143.

19. By own admission when Banks file the ***S-3 Registration Call Report*** with the Securities and Exchange Commission they admit they hold no mortgages.


## FRAUD AND MISREPRESENTATION

19. "Any false representation of material facts made with knowledge of falsity and with intent that it shall be acted on by another in entering into contract, and which is so acted upon, constitutes 'fraud,' and entitles party deceived to avoid contract or recover damages." *Barnsdall Refining Corp. v. Bimarn Wood Oil Co.,* 92 F.2d S17.

20. "Any conduct capable of being turned into a statement of fact is representation. There is no distinction between misrepresentations effected by words and misrepresentations effected by other acts." *Leonard v. Springer,* 197 Ill 532, 64 NE 301.

21. "It is not necessary for rescission of a contract that the party making the misrepresentation should have known that it was false, but recovery is allowed even though misrepresentation is innocently made, because it would be unjust to allow one who made false representations even innocently to retain the fruits of a bargain induced by such representations." *Whipp v. Iverson,* 43 Wis. 2d 166.

22. "SEC. 27. *And be it further enacted,* That it shall be unlawful for any officer acting under the provisions of this act to countersign or deliver to any association, or to any other company or person, any circulating notes contemplated by this act, except as hereinbefore provided, and in accordance with the true intent and meaning of this act. And any officer who shall violate the provisions of this section shall be deemed guilty of a high misdemeanor, and on conviction thereof shall be punished by fine not exceeding double the amount so countersigned and delivered, and imprisonment not less than one year and not exceeding fifteen years, at the discretion of the court in which he shall be tried." *The National Currency Act (otherwise known as The National Bank Act).*

23. "SEC. 28. *And be it further enacted,* That it shall be lawful for any such association to purchase, hold, and convey real estate as follows: — First. Such as shall be necessary for its immediate accommodation in the transaction of its business. Second. Such as shall be mortgaged to it in good faith by way of security for debts previously contracted. Third. Such as shall be conveyed to it in satisfaction of debts previously contracted in the course of its dealings. Fourth. Such as it shall purchase at sales under judgments, decrees, or mortgages held by such association, or shall purchase to secure debts due to said association.

**Such associations shall not purchase or hold real estate in any other case or for any other purpose than as specified in this section. Nor shall it hold possession of any real estate under mortgage, or hold the title and possession of any real estate purchased to secure any debts due to it for a longer period than five years."** *The National Currency Act (otherwise known as The National Bank Act).*

24. "SEC. 53. *And be it further enacted*, That if the directors of any association shall knowingly violate, or knowingly permit any of the officers, agents, or servants of the association to violate any of the provisions of this act, all the rights, privileges, and franchises of the association derived from this act shall be thereby forfeited. Such violation shall, however, be determined and adjudged by a proper circuit, district, or territorial court of the United States, in a suit brought for that purpose by the comptroller of the currency, in his own name, before the association shall be declared dissolved. And in cases of such violation, every director who participated in or assented to the same shall be held liable in his personal and individual capacity for all damages which the association, its shareholders, or any other person, shall have sustained in consequences of such violation." *The National Currency Act (otherwise known as The National Bank Act).* Under the National Bank Act, banks cannot lend money, it is illegal. Banks are nothing more than servicing and pooling agents.

25. "A Minnesota Trial Court's decision holding the Federal Reserve Act unconstitutional and VOID; holding the National Banking Act unconstitutional and VOID; declaring a mortgage acquired by the First National Bank of Montgomery, Minnesota in the regular course of its business, along with the foreclosure and the sheriff's sale, to be VOID.

This decision, which is legally sound, has the effect of declaring all private mortgages on real and personal property, and all U.S. and State bonds held by the Federal Reserve, National and State Banks to be null and VOID. This amounts to an emancipation of this nation from personal, national and State debt purportedly owed to this banking system." *The Credit River Decision, First National Bank of Montgomery v. Jerome Daly, December 1968, In the Justice Court, State Of Minnesota, County Of Scott, Township Of Credit River, Justice Martin V. Mahoney.*

26. "The banker testified about the mortgage loan given to Jerome Daly, but then Daly cross examined the banker about the creating of money **"out of thin air,"** and the banker admitted that this was standard banking practice. When Justice Mahoney heard the banker testify that he could **"create money out of thin air,"** Mahoney said, **"It sounds like fraud to me."** I looked at the faces of the jurors, and they were all agreeing with Mahoney by shaking their heads and by the looks on their faces." *The Credit River Decision, First National Bank of Montgomery v. Jerome Daly, December 1968, In the Justice Court, State Of Minnesota, County Of Scott, Township Of Credit River, Justice Martin V. Mahoney.*

27. The Congress licensed the use of Federal Reserve Notes to be used as money, as a medium or exchange for discharge of public and private debt into the U.S. bankruptcy. At that point Federal Reserve Notes became contraband and that gives the BATF and the IRS jurisdiction over its use and transfer. Just like trafficking in alcohol, guns, drugs or tabacco, or other substances subject to excise taxes. There are many types of commercial paper that properly prepared can discharge debt other than Federal Reserve Notes but few know how to use them. Using Federal Reserve Notes is licensed money laundering, plain and simple!

## CONSIDERATION

28. "If any part of the consideration for a promise be illegal, or if there are several considerations for an unseverable promise, one of which is illegal, the promise, whether written or oral, is

wholly void, as it is impossible to say what part or which one of the considerations induced the promise." *Menominee River Co. v. Augustus Spies L&C Co.,* 147 Wis 559, 572; 132 NW 1122.

"The contract is void if it is only in part connected with the illegal transaction and the promise single or entire." *Guardian Agency v. Guardian Mut. Savings Bank,* 227 Wis. 550, 279 NW 83.

29. "The Plaintiff (in this case the Bank) in fact never lent any of its own pre-existing money, credit, or assets as consideration to purchase the Note or credit agreement from the Defendants (the Homeowners).....when the bank does the foregoing, then in that event, there is an utter failure of consideration for the loan contract." *No.15 – Quote from The Affidavit of Walker Todd; Attorney Counselor and Legal Officer for the Federal Reserve Banks of New York and Cleveland.*

30. "The Plaintiff (in this case the Bank) is trying to use the credit application form or the Note to persuade and deceive the Defendants into believing that the opposite occurred and that the Defendants (the Homeowners) were the borrower and not the lender." *No. 17 – Quote from The Affidavit of Walker Todd; Attorney Counselor and Legal Officer for the Federal Reserve Banks of New York and Cleveland.*

31. A lawful consideration must exist and be tendered to support the Note. See <u>*Ansheuser-Busch Brewing Company v. Emma Mason,*</u> *44 Minn. 318, 46 N.W. 558*

## RICO

32. In a Debtor's RICO action against its creditor, alleging that the creditor had collected an unlawful debt, an interest rate (where all loan charges were added together) that exceeded, in the language of the RICO Statute, "twice the enforceable rate," the Court found no reason to impose a requirement that the Plaintiff show that the Defendant had been convicted of collecting an unlawful debt, running a "loan sharking" operation. The debt included the fact that exaction of a usurious interest rate rendered the debt unlawful and that is all that is necessary to support the Civil RICO action. *Durante Bros. & Sons, Inc. v. Flushing Nat. Bank,* 755 F.2d 239, cert. denied, 473 US 906 (1985).

33. The Supreme Court found that the Plaintiff in a civil RICO action need establish only a criminal "violation" and not a criminal conviction. Further, the Court held that the Defendant need only have caused harm to the Plaintiff by the commission of a predicate offense in such a way as to constitute a "pattern of Racketeering activity." That is, the Plaintiff need not demonstrate that the Defendant is an organized crime figure, a mobster in the popular sense, or that the Plaintiff has suffered some type of special Racketeering injury; all that the Plaintiff must show is what the Statute specifically requires. The RICO Statute and the civil remedies for its violation are to be liberally construed to effect the Congressional purpose as broadly formulated in the statute. *Sedima, SPRL v. Imrex Co.,* 473 US 479 (1985)

FEDERAL RESERVE BANK

34. "Each Federal Reserve bank is a separate corporation owned by commercial banks in its region . . ." *Lewis v. United States,* 680 F.2d 1239 (1982).

35. "And you recall, the Federal Reserve System works only with credit."

- *Keeping Our Money Healthy,* Federal Reserve Bank of New York, pg. 12 [revised April 1977]

36. "All the paper money issued today is Federal Reserve notes. **The real backing for the nation's money is faith** in the strength, soundness and stability of the American economy."

- *The Hats the Federal Reserve Wears,* FRB of Philadelphia, pg. 4

37. "The terms 'lawful money' or 'lawful money of the United States' shall be construed to mean gold and silver coin of the United States."

- Title 12, U.S. Code, Section 152 [12 USC 152]

38. "The Federal Government, with the cooperation of the Federal Reserve, has the inherent power to create money - almost any amount of it."

- *The National Debt,* Federal Reserve Bank of Philadelphia, pg. 8

39. "Lenin is said to have declared that the best way to destroy the capitalist system was to debauch the currency. By a continuing process of inflation, governments can confiscate, secretly and unobserved, an important part of the wealth of their citizens."

- *1980 Annual Report* Federal Reserve Bank of Richmond, pg 6.

40. "The rich ruleth over the poor, and the borrower is servant to the lender."- Proverbs 22 vs 7.
41. "If ...government retrains from regulation [e.g. taxes - BGM]...the worthlessness of the money [credit - BGM] becomes apparent, and the fraud upon the public can be concealed no longer."
- *The Economic Consequences of the Peace*, John Maynard Keynes, pg 225 [February 1920 edition]
42. "...Keynes argues that inflation is a 'method of taxation' which the government uses to 'secure the command over real resources, resources just as real as those obtained by [ordinary] taxation'. 'What is raised by printing notes, ' he writes, is just as much taken from the public as is a beer duty or an income tax.' "

- *1980 Annual Report*, Federal Reserve Bank of Richmond, pg 10

43. Employees traveling on Bank business are not subject to federal travel regulations and do not receive government employee discounts on lodging and services . . . Finally, the Banks are empowered to sue and be sued in their own name. 12 USC Section 341. They carry their own liability insurance and typically process and handle their own claims . . ." According to the Federal Reserve Bank of Philadelphia, "When the Federal Reserve was created, its stock was sold to the member banks." ("The Hats The Federal Reserve Wears," published by the Federal Reserve Bank of Philadelphia).

44. It is evident from the legislative history of the Federal Reserve Act that Congress did not intend to give the federal government direction over the daily operation of the Reserve Banks . . . The fact that the Federal Reserve Board regulates the Reserve Banks does not make them federal agencies under the Act . . . Unlike typical federal agencies, each bank is empowered to hire and

fire employees at will. Bank employees do not participate in the Civil Service Retirement System. They are covered by worker's compensation insurance, purchased by the Bank, rather than the Federal Employees Compensation Act.

45. The original Stockholders of the Federal Reserve Banks in 1913 were the Rockefeller's, JP Morgan, Rothschild's, Lazard Freres, Schoellkopf, Kuhn-Loeb, Warburgs, Lehman Brothers and Goldman Sachs. The MONEYCHANGERS wanted to be insured they had a monopoly over our money supply, so Congress passed into law Title 12, Section 284 of the United States Code. Section 284 specifically states, "NO STOCK ALLOWED TO THE U.S." *

46. Definition of 'Monopoly' - "A privilege or peculiar advantage vested in one or more persons or companies, consisting in the exclusive right [or power] to carry on a particular business or trade, manufacture a particular article, or control the sale of the whole supply of a particular commodity, A form of market structure in which only a few firms dominate the total sales of a product or service.

'Monopoly,' as prohibited by Section 2 of the Sherman Antitrust Act, has two elements: possession of a monopoly power in relevant market and willful acquisition or maintenance of that power, as distinguished from growth or development as a consequence of a superior power, business acumen, or historical product. A monopoly condemned by the Sherman Act is the power to fix prices, or exclude competition, coupled with policies designed to use and preserve that power." (Black's Law Dictionary, 6th Edition) The Federal Reserve Act goes one step farther, "No Senator or Representative in Congress shall be a member of the Federal Reserve Board or an officer or director of a Federal Reserve Bank." They didn't want _**We The People**_ to have any say in the operation of their monopoly through our elected officials.

47. And then, go to your local law library and look up the case of Lewis vs. US, case #80-5905, 9th Circuit, June 24, 1982. It reads in part: "Examining the organization and function of the Federal Reserve Banks and applying the relevant factors, we conclude that the federal reserve are NOT federal instrumentality's ...... but are independent and privately owned and controlled corporations - federal reserve banks are listed neither as "wholly-owned' government corporations [under 31 USC Section 846] nor as 'mixed ownership' corporations [under 31 USC Section 856] . . . 28 USC Sections 1346(b), 2671. '

Federal agency' is defined as: the executive departments, the military departments, independent establishments of the United States, and corporations acting primarily as instrumentality's of the United States, but does not include any contractors with the United States . . . There are no sharp criteria for determining whether an entity is a federal agency within the meaning of the Act, but the critical factor is the existence of the federal government control over the 'detailed physical performance' and 'day to day operations' of that entity.

Other factors courts have considered include whether the entity is an independent corporation . . . whether the government is involved in the entity's finances, . . . and whether the mission of the entity furthers the policy of the United States . . . Examining the organization and function of the Federal Reserve Banks, and applying the relevant factors, **we conclude that the Reserve Banks are not** federal instrumentalities ...

## <u>OBJECTIONS MUST BE IMMEDIATELY STATED</u>

Although the principle is well established that if you have any objection to the Plaintiff's filing, its terms or it's mode you have a duty in good faith to express such objection to the Court immediately. Failure to timely object within 20 days on each point will be your admission that you totally agree with all facts as stated in this instrument, and any objections that you have are thereby forever waived.

## <u>CONCLUSION</u>

I prayerfully request that this court would rule in favor of plaintiff to obtain a satisfaction of mortgage from depository institution for both these mortgage loans obtained in the usual course of commerce that were illegally conceived and executed through deception and fraud. Furthermore, I would prayerfully request that the court would mandate that Defendant would pay for their own attorney's fees, all court costs, and any all fees for said case.

-

## <u>SERVICE LIST</u>

ANGELO R. MOZILO, C.E.O., CHAIRMAN, COUNTRYWIDE
OR CURRENT OFFICE HOLDER
4500 PARK GRANADA
CALABASAS, CALIFORNIA  91302

ANDREW GISSINGER III, PRESIDENT AND
CHIEF OPERATING OFFICER, COUNTRYWIDE
OR CURRENT OFFICE HOLDER
4500 PARK GRANADA
CALABASAS, CALIFORNIA  91302

ERIC P. SIERACKI, CHIEF FINANCIAL OFFICER,
EXECUTIVE MANAGING DIRECTOR, COUNTRYWIDE
OR CURRENT OFFICE HOLDER
4500 PARK GRANADA
CALABASAS, CALIFORNIA  91302

R.K. ARNOLD, PRESIDENT AND C.E.O.
"MERS" MORTGAGE ELETRONIC REGISTRATION
SYSTEMS, INC; OR CURRENT OFFICE HOLDER
P.O. BOX 2026, FLINT, MICHIGAN 48501-2026

MERS
CT CORPORATION SYSTEM
1200 SOUTH PINE ISLAND ROAD
PLANTATION, FLORIDA  33324

# **VERIFICATION**

I verify that the statements made in the foregoing document are true and correct. I understand that false statements made are subject to the penalties of 18 Pa. C.S. 4904, relating to unsworn falsification to authorities.

Prepared and Respectfully Submitted by,

Without Recourse,

_____

Edward Waller, Plaintiff
Authorized Representative
Proper Rules of English
Article 9 Entity, strict liability

MAILING RETURN ADDRESS:
Edward Waller
3370 NE 190 STREET APT. #3913
AVENTURA, FL 33180

RE: Case No.  07-03109CA21
Loan No.  107972397 ; First Mortgage; EXHIBIT A
Loan No.  107972389 ; Second Mortgage; EXHIBIT B
Association Lien –
100 HIDDEN BAY CONDOMINIUM ASSOCIATION, INC.;

Subject Property Address:
3370 HIDDEN BAY DRIVE, APT 3913
AVENTURA, FLORIDA  33180

# EXHIBIT  A

This instrument prepared by:
FAIRMONT FUNDING, LTD
1333 60TH STREET
BROOKLYN, NEW YORK 11219
WALLER/BR11158
Parcel Identification No.: SEE ATTACHED SCHEDULE A

CFN 2005R0641095
OR Bk 23497 Pss 2139 - 2148; (10pss)
RECORDED 06/21/2005 14:03:37
MTG DOC TAX 332.50
INTANG TAX 190.00
HARVEY RUVIN, CLERK OF COURT
MIAMI-DADE COUNTY, FLORIDA

———————— [Space Above This Line For Recording Data] ————————

## FLORIDA
## HOME EQUITY LINE OF CREDIT MORTGAGE
### (Securing Future Advances)

MIN Number: 100294800036111587

THIS MORTGAGE is made on MAY 6, 2005. The mortgagor is EDWARD V. WALLER. This Mortgage is given to FAIRMONT FUNDING, LTD, whose address is 1333 60TH STREET, BROOKLYN, NEW YORK 11219 ("Lender"). In this Mortgage, the terms "you," "your" and "yours" refer to the mortgagor(s). The terms "we," "us" and "our" refer to the Lender.

"MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

Pursuant to a Home Equity Line of Credit Agreement dated the same date as this Mortgage ("Agreement"), you may incur maximum unpaid loan indebtedness (exclusive of interest thereon) in amounts fluctuating from time to time up to the maximum principal sum outstanding at any time of NINETY-FIVE THOUSAND AND 00/100ths Dollars (U.S. $ 95,000.00 ). The Agreement provides for a final scheduled installment due and payable not later than on MAY 26, 2035. You agree that this Mortgage shall continue to secure all sums now or hereafter advanced under the terms of the Agreement including, without limitation, such sums that are advanced by us whether or not at the time the sums are advanced there is any principal sum outstanding under the Agreement. The parties hereto intend that this Mortgage shall secure unpaid balances, and all other amounts due to us hereunder and under the Agreement.

This Mortgage secures to us: (a) the repayment of the debt evidenced by the Agreement, with interest, and all refinancings, renewals, extensions and modifications of the Agreement; (b) the payment of all other sums, with interest, advanced under this Mortgage to protect the security of this Mortgage; and (c) the performance of your covenants and agreements under this Mortgage and the Agreement. For this purpose and in consideration of the debt, you do hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in MIAMI DADE County, Florida:

HC#27196v.3 - Chase Correspondent FL (2/01)                    1



EXHIBIT

A

which has the address of 3370 HIDDEN BAY DRIVE #3913, AVENTURA, Florida, 33180 ("Property Address");

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, rights, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Mortgage. All of the foregoing is referred to in this Mortgage as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and cancelling this Security Instrument.

YOU COVENANT that you are lawfully seized of the estate hereby conveyed and have the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. You warrant and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

YOU AND WE covenant and agree as follows:

1.    **Payment of Principal, Interest and Other Charges.** You shall pay when due the principal of and interest owing under the Agreement and all other charges due hereunder and due under the Agreement.

2.    **Application of Payments.** Unless applicable law provides otherwise, all payments received by us under the Agreement and Section 1 shall be applied by us as provided in the Agreement.

3.    **Prior Mortgages; Charges; Liens.**   You shall perform all of your obligations under any mortgage, deed of trust or other security instruments with a lien which has priority over this Mortgage, including your covenants to make payments when due. You shall pay all taxes, assessments, charges, fines and impositions attributable to the Property which may attain priority over this Mortgage, and leasehold payments or ground rents, if any. Upon our request, you shall promptly furnish to us all notices of amounts to be paid under this paragraph and receipts evidencing any such payments you make directly. You shall promptly discharge any lien (other than a lien disclosed to us in your application or in any title report we obtained) which has priority over this Mortgage.

HC#27186v.3 - Chase Correspondent FL (2/01)          2

We specifically reserve to ourself and our successors and assigns the unilateral right to require, upon notice, that you pay to us on the day monthly payments are due an amount equal to one-twelfth (1/12) of the yearly taxes, and assessments (including condominium and planned unit development assessments, if any) which may attain priority over this Mortgage and ground rents on the Property, if any, plus one-twelfth (1/12) of yearly premium installments for hazard and mortgage insurance, all as we reasonably estimate initially and from time to time, as allowed by and in accordance with applicable law.

4.    **Hazard Insurance.** You shall keep the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards, including floods or flooding, for which we require insurance. This insurance shall be maintained in the amounts and for the periods that we require. You may choose any insurer reasonably acceptable to us. Insurance policies and renewals shall be acceptable to us and shall include a standard mortgagee clause. If we require, you shall promptly give us all receipts of paid premiums and renewal notices. If you fail to maintain coverage as required in this section, you authorize us to obtain such coverage as we in our sole discretion determine appropriate to protect our interest in the Property in accordance with the provisions in Section 6. You understand and agree that any coverage we purchase may cover only our interest in the Property and may not cover your interest in the Property or any personal property therein. You also understand and agree that the premium for any such insurance may be higher than the premium you would pay for such insurance. You shall promptly notify the insurer and us of any loss. We may make proof of loss if you do not promptly do so.

We may also, at our option and on your behalf, adjust and compromise any claims under the insurance, give releases or acquittances to the insurance company in connection with the settlement of any claim and collect and receive insurance proceeds.    You appoint us as your attorney-in-fact to do all of the foregoing, which appointment you understand and agree is irrevocable, coupled with an interest with full power of substitution and shall not be affected by your subsequent disability or incompetence.

Insurance proceeds shall be applied to restore or repair the Property damaged, if restoration or repair is economically feasible and our security would not be lessened. Otherwise, insurance proceeds shall be applied to sums secured by this Mortgage, whether or not then due, with any excess paid to you. If you abandon the Property, or do not answer within 30 days our notice to you that the insurer has offered to settle a claim, then we may collect and use the proceeds to repair or restore the Property or to pay sums secured by this Mortgage, whether or not then due. The 30-day period will begin when notice is given. Any application of proceeds to principal shall not require us to extend or postpone the due date of monthly payments or change the amount of monthly payments. If we acquire the Property at a forced sale following your default, your right to any insurance proceeds resulting from damage to the Property prior to the acquisition shall pass to us to the extent of the sums secured by this Mortgage immediately prior to the acquisition.

You shall not permit any condition to exist on the Property which would, in any way, invalidate the insurance coverage on the Property.

HC#27188v.3 - Chase Correspondent FL (2/01)          3

5. **Preservation, Maintenance and Protection of the Property; Borrower's Loan Application; Leaseholds.** You shall not destroy, damage or substantially change the Property, allow the Property to deteriorate, or commit waste. You shall be in default if any forfeiture action or proceeding, whether civil or criminal, is begun that in our good faith judgment could result in forfeiture of the Property or otherwise materially impair the lien created by this Mortgage or our security interest. You may cure such a default, as provided in Section 17, by causing the action or proceeding to be dismissed with a ruling that, in our good faith determination, precludes forfeiture of your interest in the Property or other material impairment of the lien created by this Mortgage or our security interest. You shall also be in default if you, during the loan application process, gave materially false or inaccurate information or statements to us (or failed to provide us with any material information) in connection with the loan evidenced by the Agreement, including, but not limited to, representations concerning your occupancy of the Property as a principal residence. If this Mortgage is on a leasehold, you shall comply with the lease. If you acquire fee title to the Property, the leasehold and fee title shall not merge unless we agree to the merger in writing.

6. **Protection of Our Rights in the Property; Mortgage Insurance.** If you fail to perform the covenants and agreements contained in this Mortgage, or there is a legal proceeding that may significantly affect our rights in the Property (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture or to enforce laws or regulations), then we may do, and pay for, anything necessary to protect the Property's value and our rights in the Property. Our actions may include paying any sums secured by a lien which has priority over this Mortgage or any advance under the Agreement or this Mortgage, appearing in court, paying reasonable attorney's fees, paying any sums which you are required to pay under this Mortgage and entering on the Property to make repairs. We do not have to take any action we are permitted to take under this paragraph. Any amounts we pay under this paragraph shall become additional debts you owe us and shall be secured by this Mortgage. These amounts shall bear interest from the disbursement date at the rate established under the Agreement and shall be payable, with interest, upon our request. If we required mortgage insurance as a condition of making the loan secured by this Mortgage, you shall pay the premiums for such insurance until such time as the requirement for the insurance terminates.

7. **Inspection.** We may enter and inspect the Property at any reasonable time and upon reasonable notice.

8. **Condemnation.** The proceeds of any award for damages, direct or consequential, in connection with any condemnation or other taking of any part of the Property, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to us. If the Property is abandoned, or if, after notice by us to you that the condemnor offers to make an award or settle a claim for damages, you fail to respond to us within 30 days after the date the notice is given, we are authorized to collect and apply the proceeds, at our option, either to restoration or repair of the Property or to the sums secured by this Mortgage, whether or not then due. Unless we and you otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments payable under the Agreement and Section 1 or change the amount of such payments.

9. **You Are Not Released; Forbearance by Us Not a Waiver.** Extension of time for payment or modification of amortization of the sums secured by this Mortgage granted by us to any of your successors in interest shall not operate to release your liability or the liability of your successors in interest. We shall not be required to commence proceedings against any successor in interest, refuse to extend time for payment or otherwise modify amortization of the sums secured by this Mortgage by reason of any demand made by you or your successors in interest. Our forbearance in exercising any right or remedy shall not waive or preclude the exercise of any right or remedy.

HC#2718Bv.3 - Chase Correspondent FL (2/01)        4



10.    **Successors and Assigns Bound; Joint and Several Liability; Co-signers.** The covenants and agreements of this Mortgage shall bind and benefit your successors and permitted assigns. Your covenants and agreements shall be joint and several. Anyone who co-signs this Mortgage but does not execute the Agreement: (a) is co-signing this Mortgage only to mortgage, grant and convey such person's interest in the Property; (b) is not personally obligated to pay the Agreement, but is obligated to pay all other sums secured by this Mortgage; and (c) agrees that we and anyone else who signs this Mortgage may agree to extend, modify, forbear or make any accommodations regarding the terms of this Mortgage or the Agreement without such person's consent.

11.    **Loan Charges.** If the loan secured by this Mortgage is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from you which exceed permitted limits will be refunded to you. We may choose to make this refund by reducing the principal owed under the Agreement or by making a direct payment to you. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge under the Agreement.

12.    **Notices.** Unless otherwise required by law, any notice to you provided for in this Mortgage shall be delivered or mailed by first class mail to the Property Address or any other address you designate by notice to us. Unless otherwise required by law, any notice to us shall be given by first class mail to our address stated above or any other address we designate by notice to you. Any notice provided for in this Mortgage shall be deemed to have been given to you or us when given as provided in this paragraph.

13.    **Governing Law; Severability.** The interpretation and enforcement of this Mortgage shall be governed by the law of the jurisdiction in which the Property is located, except as preempted by federal law. In the event that any provision or clause of this Mortgage or the Agreement conflicts with applicable law, such conflict shall not affect other provisions of this Mortgage or the Agreement which can be given effect without the conflicting provision. To this end the provisions of this Mortgage and the Agreement are declared to be severable.

14.    **Transfer of the Property.** If all or any part of the Property or any interest in it is sold or transferred without our prior written consent, we may, at our option, require immediate payment in full of all sums secured by this Mortgage. However, this option shall not be exercised by us if exercise is prohibited by federal law as of the date of this Mortgage.

15.    **Sale of Agreement; Change of Loan Servicer.** The Agreement or a partial interest in the Agreement (together with this Mortgage) may be sold one or more times without prior notice to you. A sale may result in a change in the entity (known as the "Loan Servicer") that collects monthly payments due under the Agreement and this Mortgage. There also may be one or more changes of the Loan Servicer unrelated to the sale of the Agreement. If there is a change of the Loan Servicer, you will be given written notice of the change as required by applicable law. The notice will state the name and address of the new Loan Servicer and the address to which payments should be made. The notice will also contain any information required by applicable law.

16.    **Hazardous Substances.** You shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Property. You shall not do, nor allow anyone else to do, anything affecting the Property that is in violation of any Environmental Law. The preceding two sentences shall not apply to the presence, use, or storage on the Property of Hazardous Substances in quantities that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property. You shall promptly give us written notice of any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which you have actual knowledge. If you learn or are notified by any government or regulatory authority, that any removal or other remediation of any Hazardous Substance affecting the Property

HC#27186v.3 - Chase Correspondent FL (2/01)        6



is necessary, you shall promptly take all necessary remedial actions in accordance with Environmental Law. As used in this Mortgage, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in this Mortgage, "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection.

17.    Acceleration; Remedies. You will be in default if (1) any payment required by the Agreement or this Mortgage is not made when it is due; (2) we discover that you have committed fraud or made a material misrepresentation in connection with the Agreement; or (3) you take any action or fail to take any action that adversely affects our security for the Agreement or any right we have in the Property. If a default occurs (other than under paragraph 14 hereof, unless applicable law provides otherwise), we will give you notice specifying: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to you, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Mortgage, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform you of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the nonexistence of a default or any other defense you may have to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, we, at our option, may declare all of the sums secured by this Mortgage to be immediately due and payable without further demand and may foreclose this Mortgage by judicial proceeding. We shall be entitled to collect in such proceeding all expenses of foreclosure, including, but not limited to, reasonable attorneys' fees as permitted by applicable law, but not to exceed 20% of the amount decreed for principal and interest (which fees shall be allowed and paid as part of the decree of judgment) and costs of documentary evidence, abstracts and title reports.

18.    Discontinuance of Enforcement. Notwithstanding our acceleration of the sums secured by this Mortgage under the provisions of Section 17, we may, in our sole discretion and upon such conditions as we in our sole discretion determine, discontinue any proceedings begun to enforce the terms of this Mortgage.

19.    Release. This Mortgage secures future advances made pursuant to the Agreement, regardless of whether at the time any such advance is made there is any outstanding indebtedness under the Agreement. Thus, you may obtain future advances pursuant to the Agreement, even though all prior indebtedness has been paid in full. At any time when all sums secured by this Mortgage have been paid in full, we will release this Mortgage at your request. You will be responsible for all costs of recording such release.

20.    Additional Charges. You agree to pay reasonable charges as allowed by law in connection with the servicing of this loan including, without limitation, the costs of obtaining tax searches and subordinations. Provided, however, that nothing contained in this section is intended to create and shall not be construed to create any duty or obligation by us to perform any such act, or to execute or consent to any such transaction or matter, except a release of the Mortgage upon full repayment of all sums secured thereby.

HC#27186v.3 - Chase Correspondent FL (2/01)          8



21.     **Documentary Stamp Taxes and Intangible Taxes.**  You agree to pay any and all present and future documentary stamp taxes and non-recurring intangible taxes with respect to this Mortgage and the Agreement. You shall indemnify and hold us harmless from and against any and all loss, liability, claim, deficiency or expense, including, without limitation, interest, penalties and legal fees, which we may have heretofore or hereafter incurred in connection with any and all present and future documentary stamp taxes and non-recurring intangible taxes with respect to this Mortgage and the Agreement.

22.     **Waiver.** No waiver by us at any time of any term, provision or covenant contained in this Mortgage or in the note secured hereby shall be deemed to be or construed as a waiver of any other term, provision or covenant or of the same term, provision or covenant at any other time.

23.     **Riders to this Mortgage.** If one or more riders are executed by you and recorded together with this Mortgage, the covenants and agreements of each such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Mortgage as if the rider(s) were a part of this Mortgage. [Check applicable box(es)]

[X]  Condominium Rider        [ ] 2-4 Family Rider        [ ] Planned Unit Development Rider

[ ]  Second Home Rider        [ ] Other(s) [specify]

IN WITNESS WHEREOF, you have hereunto set your hand and seal the day and year first above written.

Witnesses:

Print Name: Manishka V. Zephirin

Print Name: DIANE J L PARAW/UJU

Mortgagors:

_____ (Seal)
EDWARD V. WALLER
Address:

_____ (Seal)
Address:

**ACKNOWLEDGMENTS**

STATE OF FLORIDA,                     County, ss:

The foregoing instrument was acknowledged before me, on this 6th day of May, 2005, by Edward V. Waller who is personally known to me (yes/no) or who provided Florida Drivers License as identification.

My Commission expires: 10/3/08

_____
Print Name: Manishka V. Zephirin
Notary Public

Manishka V. Zephirin
Commission #DD359629
Expires: OCT. 03, 2008
Bonded Thru
Atlantic Bonding Co., Inc.

HC#27186v.3 - Chase Correspondent FL (2/01)                7

## EXHIBIT A
### LEGAL DESCRIPTION

Condominium Unit No. 3913 in 100 HIDDEN BAY CONDOMINIUM, according to the Declaration thereof, recorded March 22, 2000 under Clerk's File No. 00R-134469 in Official Records Book 19034, Page 4250, of the Public Records of Miami-Dade County, Florida, as amended and/or supplemented from time to time.

A portion of the property Appraiser's Parcel Identification No. 28-22030520010
Site Address: 3370 Hidden Bay Drive, Unit No. 3913, Aventura, Florida 33180

Loan Number BR11158

# CONDOMINIUM RIDER

THIS CONDOMINIUM RIDER is made this **6TH** day of **MAY** , **2005** , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Home Equity Line of Credit Agreement and Disclosure Statement (the "Note") to **FAIRMONT FUNDING, LTD** (the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

**3370 HIDDEN BAY DRIVE #3913, AVENTURA, FLORIDA 33180**

[Property Address]

The Property includes a unit in, together with an undivided interest in the common elements of, a condominium project known as:
**HIDDEN BAY**

[Name of Condominium Project]

(the "Condominium Project"). If the owners association or other entity which acts for the Condominium Project (the "Owners Association") holds title to property for the benefit or use of its members or shareholders, the Property also includes Borrower's interest in the Owners Association and the uses, proceeds and benefits of Borrower's interest.

CONDOMINIUM COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. CONDOMINIUM OBLIGATIONS.** Borrower shall perform all of Borrower's obligations under the Condominium Project's Constituent Documents. The "Constituent Documents" are the: (i) Declaration or any other document which creates the Condominium Project; (ii) by-laws; (iii) code of regulations; and (iv) other equivalent documents. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

**B. PROPERTY INSURANCE.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy on the Condominium Project which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, from which Lender requires insurance, then Borrower's obligation under Section 4 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, whether to the unit or to common elements, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender for application to the sums secured by the Security Instrument, whether or not then due, with any excess, if any, paid to Borrower.

**C. PUBLIC LIABILITY INSURANCE.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

MULTISTATE CONDOMINIUM RIDER--Single Family
HE3 (30/00) (Page 1 of 2)

OR B 23497 PG 2148
LAST PAGE

D. CONDEMNATION. The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property, whether of the unit or of the common elements, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 8.

E. LENDER'S PRIOR CONSENT. Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the Condominium Project, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the Constituent Documents if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

F. REMEDIES. If Borrower does not pay condominium dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this Condominium Rider.

_____ (Seal)          _____ (Seal)
EDWARD V. WALLER

MULTISTATE CONDOMINIUM RIDER--Single Family
HE3 (10/00) (Page 2 of 2)

RECORDERS NOTE
This document was received in
poor condition.

# EXHIBIT  B

CFN 2005R0641096
OR Bk 23497 Pgs 2149 - 2168; (20pgs)
RECORDED 06/21/2005 14:03:37
MTG DOC TAX 8,417.50
INTANG TAX 4,810.00
HARVEY RUVIN, CLERK OF COURT
MIAMI-DADE COUNTY, FLORIDA

Return To:
Fairmont Funding, Ltd

1333 - 60th Street    2nd
Fl., Brooklyn, NY 11219

This document was prepared by:
Fairmont Funding, LTD.
1333 - 60th Street    2nd FL.
Brooklyn, NY 11219

————————————————[Space Above This Line For Recording Data]————————————————

## MORTGAGE

MIN 1002948-0003611152-0

### DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated    May 6, 2005            ,
together with all Riders to this document.
(B) "Borrower" is EDWARD V. WALLER

Borrower is the mortgagor under this Security Instrument.
(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
(D) "Lender" is Fairmont Funding, LTD.

BR11152 WALLER
FLORIDA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS          Form 3010 1/01

-6A(FL) (0005).01
Page 1 of 16          MW 06/02.01    Initials: _____
VMP MORTGAGE FORMS - (800)521-7291

EXHIBIT

B

Lender is a New York Corporation
organized and existing under the laws of          The State of New York
Lender's address is 1333 - 60th Street      2nd FL., Brooklyn, NY 11219

(E) "Note" means the promissory note signed by Borrower and dated      May 6, 2005
The Note states that Borrower owes Lender Two Million Four Hundred Five Thousand and
no/100                                                            Dollars
(U.S. $2,405,000.00      ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than      June 1, 2035
(F) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☒ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☐ Other(s) [specify] |

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
(L) "Escrow Items" means those items that are described in Section 3.
(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.

BR11152 WALLER                                                                    0

⊄A(FL) (0005).01                          Page 2 of 16      Initials:           Form 3010  1/01

(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the                [Type of Recording Jurisdiction]

of                                                [Name of Recording Jurisdiction]:

SEE ATTACHED SCHEDULE A

Parcel ID Number:                                    which currently has the address of
3370 HIDDEN BAY DRIVE #3913                                        [Street]
AVENTURA,
("Property Address"):             [City], Florida      33180    [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BR11152 WALLER

MERS-6A(FL) (0005).01                 Page 3 of 16            Initials:                             0
                                                                                                  Form 3010 1/01

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. Application of Payments or Proceeds. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment

BR11152 WALLER

-6A(FL) (0005) 01                    Page 4 of 16              Initials: _____              Form 3010   1/01

can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. Funds for Escrow Items. Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest

BR11152 WALLER

-6A(FL) (0005).01                          Page 5 of 16                    Initials:                    0

                                                                          Form 3010  1/01

shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

BR11152 WALLER

-6A(FL) (0006).01                     Page 6 of 16          Initials: E⟍          Form 3010   1/01

0

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

BR11152 WALLER

-6A(FL) (0005).01                     Page 7 of 16            Initials: _____            Form 3010  1/01

0

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. Borrower's Loan Application. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

BR11152 WALLER

-6A(FL) (0005).01                    Page 8 of 16          Initials: ~           Form 3010  1/01                    0

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

BR11152 WALLER

-6A(FL) (0005).01                          Page 9 of 16              Initials _____        0

                                                                     Form 3010  1/01

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of

BR11152 WALLER                                                                                              0

-6A(FL) (0005) 01                        Page 10 of 18              Initials:                Form 3010  1/01

any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. Loan Charges. Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. Notices. All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers

BR11152 WALLER                                                                                                    0

-6A(FL) (0005).01                              Page 11 of 16                Initials: ____          Form 3010  1/01

unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the

BR11152 WALLER

-6A(FL) (0005).01                     Page 12 of 16              Initials:          0

Form 3010  1/01

purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. Sale of Note; Change of Loan Servicer; Notice of Grievance. The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

BR11152 WALLER

-6A(FL) (0005).01                        Page 13 of 16        Initials ____        Form 3010   1/01        0

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Attorneys' Fees. As used in this Security Instrument and the Note, attorneys' fees shall include those awarded by an appellate court and any attorneys' fees incurred in a bankruptcy proceeding.

25. Jury Trial Waiver. The Borrower hereby waives any right to a trial by jury in any action, proceeding, claim, or counterclaim, whether in contract or tort, at law or in equity, arising out of or in any way related to this Security Instrument or the Note.

BR11152 WALLER

-6A(FL) (0005).01                          Page 14 of 16                          Initials: _____          Form 3010   1/01          0

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.
Signed, sealed and delivered in the presence of:

_____ (Seal)
EDWARD V. WALLER                    -Borrower

7649 WOOD DUCK DR, BOCA RATON, FL
33434                               (Address)

_____ (Seal)
                                    -Borrower

                                    (Address)

_____ (Seal)          _____ (Seal)
                    -Borrower                              -Borrower

                    (Address)                              (Address)

_____ (Seal)          _____ (Seal)
                    -Borrower                              -Borrower

                    (Address)                              (Address)

_____ (Seal)          _____ (Seal)
                    -Borrower                              -Borrower

                    (Address)                              (Address)

BR11152 WALLER
-6A(FL) (0005) 01          Page 15 of 16          Form 3010   1/01          0

STATE OF FLORIDA,
   The foregoing instrument was acknowledged before me this 6th day of May 2005 by
EDWARD V. WALLER

County ss: Miami-Dade

who is personally known to me or who has produced Florida Drivers License as identification.

Manishka V. Zephirin
Commission #DD359629
Expires: OCT. 03, 2008
Bonded Thru
Atlantic Bonding Co., Inc.

Notary Public

BR11152 WALLER
6A(FL) (0008).01                    Page 16 of 16                    Initials _____    0
                                                                      Form 3010  1/01

# CONDOMINIUM RIDER

THIS CONDOMINIUM RIDER is made this    6th    day of May, 2005    .
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or
Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to
secure Borrower's Note to

Fairmont Funding, LTD., New York Corporation

"Lender") of the same date and covering the Property described in the Security Instrument and located at:                                                                                              (the

3370 HIDDEN BAY DRIVE #3913, AVENTURA, FL 33180
[Property Address]

The Property includes a unit in, together with an undivided interest in the common elements of, a
condominium project known as:

HIDDEN BAY
[Name of Condominium Project]

(the "Condominium Project"). If the owners association or other entity which acts for the Condominium
Project (the "Owners Association") holds title to property for the benefit or use of its members or
shareholders, the Property also includes Borrower's interest in the Owners Association and the uses,
proceeds and benefits of Borrower's interest.

CONDOMINIUM COVENANTS. In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

A. Condominium Obligations. Borrower shall perform all of Borrower's obligations under the
Condominium Project's Constituent Documents. The "Constituent Documents" are the: (i) Declaration or
any other document which creates the Condominium Project; (ii) by-laws; (iii) code of regulations; and
(iv) other equivalent documents. Borrower shall promptly pay, when due, all dues and assessments
imposed pursuant to the Constituent Documents.

B. Property Insurance. So long as the Owners Association maintains, with a generally accepted
insurance carrier, a "master" or "blanket" policy on the Condominium Project which is satisfactory to
Lender and which provides insurance coverage in the amounts (including deductible levels), for the
periods, and against loss by fire, hazards included within the term "extended coverage," and any other
hazards, including, but not limited to, earthquakes and floods, from which Lender requires insurance,

BR11152 WALLER
MULTISTATE CONDOMINIUM RIDER-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                                              0

-8R (0008)    Form 3140 1/01
Page 1 of 3 MW 08/00    Initials:
VMP MORTGAGE FORMS - (800)521-7291

then: (i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, whether to the unit or to common elements, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender for application to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

C. **Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

D. **Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property, whether of the unit or of the common elements, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

E. **Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the Condominium Project, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the Constituent Documents if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

F. **Remedies.** If Borrower does not pay condominium dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

BR11152 WALLER

-8R (0008)                    Page 2 of 3              Initials: ℯ↳              0

                                                                 Form 3140 1/01

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this Condominium Rider.

_____ (Seal)                    _____ (Seal)
EDWARD V. WALLER          -Borrower                                             -Borrower

_____ (Seal)                    _____ (Seal)
                          -Borrower                                             -Borrower

_____ (Seal)                    _____ (Seal)
                          -Borrower                                             -Borrower

_____ (Seal)                    _____ (Seal)
                          -Borrower                                             -Borrower

BR11152 WALLER
                                                                         0
-8R (0008)                          Page 3 of 3              Form 3140 1/01

OR BK  '3497  PG  2168
LAST   ,GE

## EXHIBIT A
### LEGAL DESCRIPTION

Condominium Unit No. 3913 in 100 HIDDEN BAY CONDOMINIUM, according to the Declaration thereof, recorded March 22, 2000 under Clerk's File No. 00R-134469 in Official Records Book 19034, Page 4250, of the Public Records of Miami-Dade County, Florida, as amended and/or supplemented from time to time.

A portion of the property Appraiser's Parcel Identification No. 28-22030520010
Site Address: 3370 Hidden Bay Drive, Unit No. 3913, Aventura, Florida 33180

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT, IN AND
FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO.: 08-63009-CA-20

EDWARD WALLER,

      Plaintiff,

vs.

COUNTRYWIDE HOME
LOANS, INC., et al.,

      Defendants.

_____/

## NOTICE OF FILING NOTICE OF REMOVAL TO FEDERAL COURT

PLEASE TAKE NOTICE that Defendants Countrywide Home Loans, Inc.
(**Countrywide**) has, this 26th day of November, 2008, submitted for filing in the United States
District Court for the Southern District of Florida, Miami Division, its *Notice of Removal* of this
case, pending in the Circuit Court, in and for Miami-Dade County, Florida.  This case has now
been removed to federal court.  A copy of said notice of removal is attached as **EXHIBIT A**.

Respectfully submitted,

William P. Heller
Florida Bar No. 987263
e-mail:  william.heller@akerman.com
Eric S. Matthew
Florida Bar No. 0026539
e-mail:  eric.matthew@akerman.com
**AKERMAN SENTERFITT**
350 East Las Olas Blvd., Suite 1600
Fort Lauderdale, Florida  33301
(954) 759-8945(ph)/(954) 463-2224(fax)
*Counsel for Countrywide Defendants*


EXHIBIT
B

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was served by U.S. mail this

26th day of November, 2008 to plaintiff *pro se* Edward Waller at 3370 NE 190th Street, Apt. #

3913, Aventura, FL 33180, and at 3370 Hidden Bay Drive, Apt 3913, Aventura, Fl 33180.

Eric S. Matthew

JS 44 (Rev. 2/08)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)   NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.

## I. (a) PLAINTIFFS

Edward Waller

**DEFENDANTS**

Countrywide Home Loans, Inc., et al.

**(b)** County of Residence of First Listed Plaintiff   Miami-Dade
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   New York, California
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT LAND INVOLVED.

CIV - ALTONAGA
MAGISTRATE JUDGE
BROWN

08 - 23303

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Edward Waller, pro se
3370 NE 190 Street, Apt 3913
Aventura, FL 33180

08 - 23303 - Altonaga/Brown

Attorneys (If Known)

Jeffrey A. Trinz, Esq. Eric S. Matthew, Esq. William P. Heller, Esq.
One Southeast 3 Ave., Flr 25, Miami, Florida 33131

**(d)** Check County Where Action Arose: ☑ MIAMI-DADE ☐ MONROE ☐ BROWARD ☐ PALM BEACH ☐ MARTIN ☐ ST. LUCIE ☐ INDIAN RIVER ☐ OKEECHOBEE HIGHLANDS

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff
☑ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☑ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☑ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☒ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | **IMMIGRATION** | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 462 Naturalization Application | | |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 463 Habeas Corpus-Alien Detainee | | ☐ 950 Constitutionality of State Statutes |
| | | | ☐ 465 Other Immigration Actions | | |

FILED by ___ A.S. ___ D.C.
NOV 26 2008
STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

## V. ORIGIN (Place an "X" in One Box Only)

☐ 1 Original Proceeding
☑ 2 Removed from State Court
☐ 3 Re-filed- (see VI below)
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. RELATED/RE-FILED CASE(S).

(See instructions second page):

a) Re-filed Case ☐ YES ☑ NO   b) Related Cases ☑ YES ☐ NO

JUDGE Huck/O'Sullivan   DOCKET NUMBER 08-61711-CIV

## VII. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity):

Plaintiff is suing under RICO (18 USC 1961 et seq) and Civil Rights Act (42 USC 1983)

LENGTH OF TRIAL via 5 days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☑ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD
s/

DATE
11/26/08

FOR OFFICE USE ONLY
AMOUNT $350.00   RECEIPT # 99100   IFP

11/26/08